Turning to the regular argument calendar, the first case is Nadine O'Field and others versus Parmley and Smith. Good morning, judges. May it please the court. My name is John Mann. I represent the appellants, the Onondaga 15, and initially I just want to thank Dana Elwood and the clerk's office for keeping me on the rails. This case, in my view, is the definition of justice delayed is justice denied. This case is the definition of unfair process. This case is the definition of unfair trial, in my view. The district court, in my view, took away the right, each one of these 15 Onondaga were individuals, not a class, not a unit, not a, they each had their own claims, and the district court took away their opportunity to present their case by conducting the direct examination of the witnesses they called. They were pro se, weren't they? They were pro se. And doesn't the trial judge have a right to impose some sort of order on the proceedings? No question about that, Judge Pooler, no question. Doesn't he have to make sure that the jury gets the information it needs to decide the case? No question about it. Okay, go on. So what was wrong? He went way beyond that, Judge Pooler. He was faced with 15 plaintiffs, and I think it was something like 51 police officers, and each plaintiff wanted to cross-examine not only each other, all the plaintiffs, but all the police officers, and I did a little math there. That's about 999 examinations that would have had to take place, and you don't think the judge was entitled to try and get some control over the situation, particularly with circumstances in which some of the questions that were being asked, a lot of the questions that were being asked were irrelevant or designed to make a political point? Well, Judge Walker, under 611, under Federal Rules of Evidence, they have a right to cross-examine. You ordinarily have a right to cross-examine each adverse witness, adverse party. Well, there was . . . the witnesses that were put on were subject to questioning by the other side, but this was hardly a manageable situation, and it seemed to me that the judge was trying to do his best. I don't think there's no evidence in the record of the judge showing bias, I don't think. Well, I don't have to get to bias at all, Judge Walker. I'm not trying to suggest that. I'm suggesting that the judge took away the general trial practice rules of when a witness is called, the party questions the witness. This isn't an ordinary trial. This was fifteen pro se plaintiffs trying to question fifty-one defendants. But Judge . . . But he didn't even give them an opportunity to present their argument of why a question was relevant. He let them have narrative testimony, which is more than most witnesses get. Well, Judge Newman, let me put it this way. Is that correct? He did allow narrative testimony, but let me put it this way. Seventeen years into this court allowed the lawyers that had represented them for seventeen years to get off the record. I find that . . . I've practiced for forty years. I find that astonishing . . . Well, then we have to look at the facts under which he granted that motion, and find out whether there was a conflict between the lawyers and the clients, whether they were in agreement, or whether there were irreconcilable differences. I agree with you totally, Judge Walker, but that didn't happen. No, but there was no hearing. You've got to have a hearing. You've got to have the fifteen on a daga here, and say . . . Because after the order came out, they each . . . every one of them filed, we object to this order, and nothing, not one thing was done about that, nothing, even though they filed the objections, and that's in the record of the joint appendix. Were you certain there was no objection after he entered the order? Yes, at 494 through . . . 464 through 499. He didn't give them an opportunity to oppose the motion? Oh, there was an opportunity to oppose it in writing, and some did. You're complaining about lack of a hearing on the motion? Absolutely. Did any plaintiff request a hearing? Not that I'm aware of. Well, then how can you fault the judge for not giving them one? Judge Newman, they were represented for seventeen years by these lawyers. They have no idea about practice in any court, let alone the federal district. That was the point. That's why the judge had to manage the trial differently than if he had two lawyers arguing the cases. He had fifteen pro se plaintiffs. Well, Judge Fuller, I don't disagree that having unrepresented clients in a trial can be difficult at best. Counsel, will you agree that there's a very high standard that you have to meet to find that the judge abused his discretion in these areas which are committed to his discretion? Well, I agree with that, Judge Fuller, but I actually attended the trial, so I heard the give and take. The thing that is so shocking is that each of these individuals had a right to question. Well, he didn't say, Mr. Andrew Jones, what questions do you have? He had to go through each and every one of those, and I agree, it takes a long time possibly to do that. But they waited twenty years to present their case, twenty years, and all of a sudden they're on speed dial to race through this trial. It was just astonishing to me. What's the rush? They did all their testimony within a day. Can I turn in the seconds remaining to a different complaint, different part of the complaint? Well . . . That is that the judge used the wrong standard. Well, Judge Sotomayor and Judge Newman and Judge Walker were on the case ten years ago. That found no qualified immunity, correct. Right, but the jury instructions, in my view, what was set forth by Judge Sotomayor in her opinion, was a road map for . . . They should have been instructed on clear and present danger. They should have been instructed that, you know, if no one went on the road, they didn't lose their First Amendment rights. They were not instructed on those. On a motion like that, you take the facts in a light most favorable to the plaintiff. I agree. They do not become law of the case. Absolutely. That's not law of the case. So, it would have been inappropriate to charge the jury in accordance with . . . and to use a factual premise for that charge, based upon the motion. Well, Judge Walker, the reason I say it would be appropriate, and very appropriate, is because after trial, they had the facts. And the facts were no one was on the . . . the video shows it. No one's on the road. No one's on the road. So, they were even stronger facts than the motion for summary judgment after trial, is my point. But they didn't even . . . Video . . . You know, you're now talking about what the evidence shows. There was testimony to the contrary. That's true. That's true. But . . . For the jury to decide that. But the jury didn't know about clear and present danger. They didn't know about . . . You know, if you didn't go on the . . . the facts were undisputed that none of the 15 ever went on the road. And no one was . . . the jury was not told, you know, if you don't go on the road, you don't lose your First Amendment rights. That's a pretty important part of the puzzle. Certainly, the jury should have been . . . The argument is that the judge used the wrong formulation of the charge. He used the retaliation instead of the clear and present danger charge. Is that your argument? Well, clear and present danger should have been front and center. I agree. I think that should have been front and center. Instead, the judge charged First Amendment retaliation. Isn't that correct? Frankly, I'm not sure about that. I'm not sure about that. I just know that clear and present danger wasn't . . . they weren't informed on that. And the easement . . . Was the objection to the charge . . . And I'm giving lots of leeway because I know these were pro se plaintiffs. Was that objected to? In pages 1213 through 1218, 1241, and 1280 through 1282, this was preserved, in my view. And again, pro se, they don't know anything about rules. It took me years . . . it takes us years to figure this stuff out. And the pro se . . . It's taken years to try the case, too. Twenty years. Unbelievable. I can't . . . So, it's preserved there, Judge Pooler. And the easement, also, raised by Andrew Jones, who's here in court. He raised it. And the easement thing . . . And I agree with you, Judge Walker, that the easement thing was raised in the summary judgment motion. But, if it was wrong, then the New York State Police . . . The Attorney General could have clarified that quickly by what the public record shows what the easement is. As Judge Sotomayor said, it was just the paid portion. So, when the jury came back with a question on that . . . What is this easement business? All of a sudden, easement was on their mind. And because they weren't told what the easement was . . . That had a big bearing and was very prejudicial to the verdict that was rendered. They had gotten past the point of . . . Hey, are they liable? They might not be liable, according to what I read into the jury is . . . Well, they thought the easement went on wherever they went on the property. Well, that was private property. You mentioned a minute ago that you were present at the trial. Yes, I was. What was your capacity there? A good friend of mine in Arizona told me about this. So, you were an observer. You weren't a professional. Well, I was an observer, but I did . . . I was not representing them, but I was advising them. And, in fact, Judge Scullin invited me into his chambers and said . . . He knew I was there, and he said it would be nice if you assisted him. I did try to assist, Your Honor. But, obviously . . . Counsel, your time has expired, but you reserve three minutes for rebuttal. Thank you, Judge Brewer. We'll hear from the state defendants, Mr. Parmelee and others. Thank you. Thank you, Your Honor. Counsel, do you agree that the trial judge gave the wrong charge about the dispersal? I don't agree with that. Tell me why not. Well, as far as First Amendment goes, the trial judge charged that you needed an immediate threat to public safety to overcome First Amendment protections. That's on ECF number 807 at 1298. And that is essentially a summary of . . . on the facts. Well, I would suggest that if Your Honor thinks there was an error there, and I don't, that the error was immaterial because the proof supported the jury's finding that no First Amendment violation occurred because the record overwhelmingly showed that the state trooper's objective was not to suppress speech. Instead, the police expressed their concern that the protesters on the highway created a public safety hazard, and the trooper's goal was to abate that hazard. There is no testimony to the contrary. And, in fact, there was an immediate threat to public safety. I mean, Route 81 is a four-lane interstate highway. Inspector Blythe testified that all lanes were fully open at the time. So you're talking about a big road where cars, trucks traveling 55 miles an hour at least, and people are walking on there. There was a lady with a baby carriage on the road. There is a large amount of testimony about people on the road. Three weeks before, a similar protest had turned violent, and a motorist was killed. That's on ECF number 804 at page 710 and ECF number 802 at page 387. The Jones family, shortly before this incident, had asked a violent group called the Warrior Society to become involved. That's Inspector Blythe's testimony, ECF number 804 at page 710. And all those factors combined to create certainly a jury question as to whether there was a clear and present danger. And I submit it did overcome the First Amendment protection, and the jury was properly charged. I would also note that none of plaintiffs' challenges to the jury charge was preserved, and therefore they have to show plain error that affected their substantial rights. Wasn't it maybe oblique, but didn't they object by asking for Judge Sotomayor's opinion be entered in the record in which she discusses the clear and present danger test? Isn't that correct? Well, it's correct that they ask that Judge Sotomayor's opinion be entered into the record. I would submit that, as Judge Walker pointed out, that's an opinion on summary judgment, where the court assumed plaintiff's version of facts was true. I am not suggesting that the opinion should have been entered in the record, but the fact of the opinion talks about the clear and present danger test. She gives a roadmap. She tells them what to do. The opinion does talk about the clear and present danger test. I think that the judge's charge on immediate threat to public safety encapsulates that test. And in any event, the question is not whether Judge Sotomayor could have written a better jury charge than Judge Scullin. The question is whether Judge Scullin's jury instructions were plainly erroneous. Correct.  Unless we view that their insistence on entering that opinion into the record preserved the argument on the quality of the charge, what the charge should say. I think you could view it as preserving if they had said, you know, Judge Sotomayor said this about First Amendment rights and clear and present danger. And they didn't say that. They just had this undifferentiated opinion, and they wanted it read to the jury. They were pro se plaintiffs, and we give them some leeway in assessing their handling of the trial. You give them some leeway, but you also need to have a specific objection to the charge for the court to be able to respond to it. The court's not going to say, okay, I'm going to throw away my charge, and I'm going to re-judge Sotomayor's opinion into the record. They're not going to say that. But if you said, you know what, your charge got the specific wording of the First Amendment defense wrong, and Judge Sotomayor got it right, and you should put in the First Amendment or something about the First Amendment, then you might have preservation. And as to the other charge issues, you know, individual liability, they did ask, I think, for a conspiracy charge. The problem here is, for that argument, that the jury found that no one's civil rights had been violated. A conspiracy charge simply makes one defendant liable for the acts of others. But here, there was no defendant that was found to have violated anyone's civil rights. No plaintiffs' civil rights were found to have been violated. So therefore, the conspiracy charge, and that was specifically preserved, but it was moot. And I would also add that the district court correctly instructed the jury that each defendant's liability must be shown individually. That's a basic that to charge, to hold someone liable for violating civil rights, some personal involvement is required. Let me speak briefly. JUSTICE KENNEDY I want to ask you about the delay. First, the delay from the filing of the complaint until the motion for qualified immunity, for summary judgment. That was a seven-year delay. Was there some particular reason for that delay? MR. CLEMENT Well, yes. This was a large, complex litigation. Originally, there were 94 plaintiffs and 57 defendants. More than 50 depositions were taken. There was voluminous discovery and extensive motion practice. And there were more than 800 docket entries. JUSTICE KENNEDY So discovery was the main reason for the delay before the qualified immunity motion? MR. CLEMENT Right. And I would note that the motion was decided— JUSTICE KENNEDY How about from the decision of that motion until the trial? That was about 10 years. MR. CLEMENT Well, at that point, the parties engaged in a mediation, which eventually resulted in most of the 94 plaintiffs settling. It was only these 15 who said, we're not settling. And that settlement took hundreds of hours and five years to finalize. That's on page 461 of the Joint Appendix. So if anyone's responsible for delay— JUSTICE KENNEDY It took five years to settle it or to negotiate it? What was it? MR. CLEMENT Five years to negotiate and finalize the settlement. JUSTICE KENNEDY Who were the parties to the negotiation? MR. CLEMENT I believe it was counsel for the plaintiffs and counsel for—and Mr. Mulvey, our counsel from the Attorney General. JUSTICE KENNEDY I mean, I understand it's complicated, but five years seems like a long time for lawyers to meet to settle a case. MR. CLEMENT Well, I think, you know, you're talking about— So the government's initial position for the State defendants was that we want everyone on board. We want a global settlement. And there were efforts made toward that end to get the global settlement. But at the end, after the settlement had been negotiated, these 15 plaintiffs backed out of it and said in what Robert and Cheryl Bucktooth candidly described to the Court as buyer's remorse, that's ECF number 501 at page 1, buyer's remorse, they said, well, no, we don't want to settle after all. And then the government had to make a decision. Do we want to have this trial anyway, even though we're—you know, even—do we want to settle even though we have to have this trial anyway? And ultimately, the government agreed to settle with everyone, except these 15 plaintiffs wouldn't agree. So if there's an issue with delay, I would put that firmly on the shoulders of these plaintiffs. Thank you, Your Honors. JUSTICE SOTOMAYOR Thank you, Counsel. Next, we'll hear from Counsel for Mr. Smith, who is one of the troopers, correct? He has his own counsel. He's the only one. BRITTANY LAWRENCE That's correct, Your Honor. JUSTICE SOTOMAYOR Yes. Continue. BRITTANY LAWRENCE May it please the Court. My name is Brittany Lawrence. I represent Appellee Joseph Smith. If I may, Your Honor, I just want to address the objection issue. In response to what Mr. Brody had mentioned, I believe appellants objected in the context of the Rule 50 motions. They did not preserve the objection in the context of when the district court asked if there were any objections to the jury instructions. JUSTICE SOTOMAYOR But didn't they continually talk about what they called the Sotomayor opinion? Didn't they continually talk about that? And doesn't that objection embody everything in that opinion? BRITTANY LAWRENCE They did continually raise this issue, Your Honor. However, I think it's clear in the transcript that the district court asked all parties if there were any objections to the jury instructions, and they did not raise it at that point in time. JUSTICE SOTOMAYOR Did he supply a copy of the proposed jury instructions to the plaintiffs? BRITTANY LAWRENCE I believe he did, Your Honor. JUSTICE SOTOMAYOR In writing, I mean, so that they all had time to review it? BRITTANY LAWRENCE I believe they did, Your Honor. The appellants were not required to submit their own jury instructions, but they certainly had an opportunity to review them and make any objections. JUSTICE SOTOMAYOR Actually, it was your client, Mr. Smith, who proposed the retaliation charge, the First Amendment retaliation charge, as opposed to the clear and present danger charge. Isn't that correct? BRITTANY LAWRENCE I believe that is correct, Your Honor, and we feel that the jury was properly instructed on the First Amendment. JUSTICE SOTOMAYOR Okay. Continue. BRITTANY LAWRENCE Now, there's one factual issue I wanted to address. It's important to remember that the only claims against our client were First Amendment claims. There were no excessive force claims and no state law tort claims. And with respect to the fair trial, the district court did not abuse its discretion when it modified the standard trial procedure. I think it's helpful to look at our client's trial transcript because it becomes clear that the district court's modifications were intended to help facilitate the presentation of admissible evidence. The district court initially asked some introductory questions to help focus the witness on the day in question, and then the district court did not interfere with many of the questions that appellants asked. Initially, one of the plaintiffs was required to do all of the questioning. However, the district court permitted another plaintiff to also do some questioning. JUSTICE SCALIA Well, that was after a period of experimentation with more questioning, right? In other words, more people were asking questions before the judge settled on the particular person who was to take the lead in the questioning. BRITTANY LAWRENCE That's correct. JUSTICE SCALIA And so the judge assessed the quality of the questioning and ended up selecting a woman, I believe, who was asking the most relevant and was the best questioner. BRITTANY LAWRENCE That's correct, Your Honor. It was Ms. Cheryl Bucktooth. But my point is the district court did not limit all of the questions. If the plaintiffs had additional questions that they wanted to ask, the district court was reasonable, allowed the additional questions to come in. JUSTICE SCALIA And that procedure was that they could write out the questions and submit them to him for review as to whether they were relevant or not. BRITTANY LAWRENCE That's correct, Your Honor. With respect to Joseph Smith's trial transcript, it's helpful to show that the district court asked questions to help clarify some of the plaintiff's questions. The district court would ask follow-up questions. So it really shows that the district court was, although it was taking a more active role, the modifications were made to help elicit admissible evidence. And the district court even allowed the use of deposition testimony throughout Mr. Smith's trial testimony. JUSTICE GINSBURG Your time has expired. BRITTANY LAWRENCE Thank you, Your Honor. JUSTICE GINSBURG Thank you. Mr. Mann, you've reserved three minutes for rebuttal. MR. MANN Thank you, Judge Pooler. Getting over to the reason for the settlement Judge Newman raised, the lawyers . . . it is noteworthy to note that the lawyers withdrew after the 15 would not settle. Well, they would represent them if they settled, so it hardly suggests that the communication had broken down. And so, you know, that . . . and it's that withdrawal that caused all the unfairness that followed because judges don't like to have unrepresented . . . JUSTICE GINSBURG What is the standard by which a judge can allow a lawyer to withdraw? MR. MANN Discretion. JUSTICE GINSBURG The judge concluded that the relationship had broken down. MR. MANN But without any . . . Judge Pooler, without any discourse asking the individual plaintiffs, you know, in my practice, I always have to have my client there if I'm withdrawing because the judge wants to know can they get new lawyers, number one. The interest of the client is primary. The lawyer's interest is of no consequence on this withdrawal. It's the fifteen unadulterated interests that were the primary interest of the court, or should have been, because they had absolutely . . . I have a better chance of laying on Mars than them getting a lawyer at this . . . seventeen years into this litigation. They weren't going to get a lawyer, and that would have been clear at a hearing, and they wanted their lawyers to stay there, and it added to the unfairness of it all. JUSTICE GINSBURG The judge should have impressed these lawyers into service, whether they wanted to represent, whether they felt they could represent these plaintiffs or not? MR. MANN In my view, Judge Pooler, the district court should have ordered the fifteen individual plaintiffs into court and asked them directly, was there a breakdown? If there was, you know, if there was a breakdown, you know, they have to withdraw probably, but they can't get a lawyer. JUSTICE GINSBURG Some argument or arguendo that such a hearing would have disclosed that the relationship had broken down. MR. MANN Might have, but for each fifteen, each of the fifteen, did each of the fifteen have a breakdown? Highly, I mean, highly unlikely, Your Honor. I mean, I don't think these . . . JUSTICE GINSBURG All fifteen plaintiffs at that point, correct? MR. MANN Two firms, two firms represented. JUSTICE GINSBURG And they both sought to withdraw. MR. MANN Yes. At the time, there was settlement. There was settlement, and they wouldn't go along with the settlement, and one of them had been paid, and they weren't getting paid. I mean, this was classic, you know, 76 are settling. We don't want to spend months trying a case, and if it was done properly, this would have taken a while, but it wasn't done properly. Why? Because those lawyers were nowhere to be found. I can't say enough bad things about this case. These plaintiffs, these fifteen individual plaintiffs, waited twenty years for justice, and I don't care who was the plaintiff. They should have had their right to present their cases and present it, and the judges . . . I get back to the judges' interference and so on. It wasn't based upon the Attorney General objecting. I mean, the Attorney General was there and properly represented. If he had objections, he could have stood up and objected throughout. It was the judge that took over. He became the advocate. He, in my view, tainted the jury, and even . . . JUSTICE SCALIA I don't understand that he was the advocate. I understand that he was trying to manage a very difficult trial with a huge number of defendants and plaintiffs, unrepresented, and he did elicit questions, but judges are entitled to do that as a matter of discretion if it furthers the proceedings. I mean, to what extent . . . How were they prejudiced by this? JUSTICE BREYER They couldn't present their case. JUSTICE SCALIA More specifically, yes, of course they couldn't. They didn't have a lawyer at that point, but they had to do the questioning this way, but specifically, were certain facts not brought out? It seems to me that all the facts that were relevant here were brought out. One of the glaring points of this case is when Sean Jones, Nadine Bucktooth, and Robert Bucktooth III testified. You will find their testimony at 296 and 300, 296 and 300, and 244 through 254. I encourage you to check that out. That's on day two of the trial. In that, the judge just asked Nadine and Robert, well, were you near the fire? You were running away from the fire. They were saying, well, I wanted to go sing and dance, and I was looking forward to that. I heard screaming, and I started running. With that, at the directed verdict stage, he said, well, they weren't near the fire, so their assembly wasn't disrupted, and they had no injury. He directed them out. And Sean Jones, as you know, couldn't communicate well at all, and so he didn't even testify. But his sister put him there, saying he was with her. Well, she survived directed verdict, but Sean didn't. These three waited 20 years, 20 years, unbelievable, and here they're gone in a flash. The judge, the district court didn't . . . There was no objection to this. The other glaring thing is when the attorney general finally called a witness, the judge led the direct questioning. He did the direct questioning, and he said, whoa, I shouldn't be doing this. Well, of course he shouldn't. He shouldn't be creating evidence. There was no attorney on the other side to do the questioning. No, no. I'm talking about when the attorney general . . . You're talking about direct of the government's witness. Right. Yeah, the government's witness. They called one witness, the attorney general, and the district court did the direct examination. Gotten into the habit, I guess. But it couldn't be more erroneous. I've never heard such a thing where the judge is creating . . . I mean, there's an art. I mean, we've spent years trying to figure this stuff out, but you don't just say, oh, I just see. Okay, thanks. Goodbye. I mean, if I did that, I would have lost every case. All right. Your time has long expired. Thank you. Well, thank you. If I could just briefly . . . My clients, the 15 Onondaga, just want their day in court. In my view, this was injustice, and they just want to be able to present their case. They've waited 20 years. Some people have died in the meantime, but the 15 Onondaga want their day in court. I'm asking this court for a new trial or directed verdict under Judge Sotomayor's opinion. I think they're entitled to a directed verdict because the facts are so spectacular after the . . . much better than they were at the summary judgment where she was dealing with 91 plaintiffs, and some were on the road and causing problems on the road. That wasn't the case in the jury trial. So thank you for your indulgence on that. Thank you all. Thank you. A reserved decision.